UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SANIYYAH LANGSTON,

      Plaintiff,                            Civil Action No. 16-11360

v.                                 HON. JOHN CORBETT O'MEARA
                                    U.S. District Judge
                                    HON. R. STEVEN WHALEN

COMMISSIONER OF SOCIAL           U.S. Magistrate Judge
SECURITY,

      Defendant.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Saniyyah Langston ("Plaintiff") brings this action under 42 U.S.C. §405(g) challenging a final decision of Defendant Commissioner ("Defendant") denying her application for Disability Insurance Benefits ) ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act. Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons set forth below, I recommend that Plaintiff's Motion for Summary Judgment [Dock. #17] be DENIED, and that Defendant's Motion for Summary Judgment [Dock. #18] be GRANTED.

# I.  PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI on December 2, 2014, alleging disability as of January 6, 2014 (Tr. 179-185, 186-191).  After the initial denial of benefits, Plaintiff requested an administrative hearing, held on September 22, 2015 in Livonia, Michigan (Tr. 34).  Administrative Law Judge ("ALJ") Richard L. Sasena presided.  Plaintiff, represented by Michael Korby, testified (Tr. 39-56), as did Vocational Expert ("VE") Luann Castellana (Tr. 56-61).  On January 5, 2016, ALJ Sasena found Plaintiff not disabled (Tr. 10-28).  On February 9, 2016, the Appeals Council denied review (Tr. 1-3).  Plaintiff filed for judicial review of the final decision on April 14, 2016.

# II.  BACKGROUND FACTS

Plaintiff, born February 8, 1989, was one month short of her 27th birthday at the time of the ALJ's decision (Tr. 28, 179).  She completed one year of college and worked previously as a direct care giver, maintenance worker, and nail technician (Tr. 277-278).  She alleges disability due to seizures, depression, anxiety, and injuries of the back, shoulders, and left leg (Tr. 276).

### A.  Plaintiff's Testimony

Plaintiff offered the following testimony.

She stopped working as a direct care giver in early 2014 as a result of a car accident (Tr. 40).  She continued to "do nails" for an unspecified period between the automobile

accident and the December 2, 2014 application for benefits (Tr. 40-41).

Plaintiff required "supervision" due to seizures, muscle spasms of the left shoulder and left leg, as well as chronic neck and back pain since sustaining the motor vehicle injury (Tr. 42-43). She was a party to a lawsuit filed against the owners of the snow plow (Tr. 44). She currently lived in a two-story townhouse with her four children and brother (Tr. 46). She was cared for by her uncle, brother, and cousin (Tr. 46-47). She received health care and benefits through Michigan's Department of Human Services (Tr. 47). Her caretakers assisted her with "supervision," transportation to doctors' appointments, and medication reminders (Tr. 48).

In response to questioning by her attorney, Plaintiff testified that she was unable to walk more than short distances (Tr. 49). She used a cane to relieve the pressure on her lower back (Tr. 49). She was unable to stand for more than five minutes or sit for more than 30 (Tr. 49). She was unable to lift more than five pounds (Tr. 50). She was currently taking medication for seizures but nonetheless experienced seizures several times a month due to stress and anxiety (Tr. 50). After experiencing a seizure, she felt fatigued, disoriented, and dizzy for several hours (Tr. 50-51). She experienced the medication side effects of blurry vision, fatigue, and nausea (Tr. 51).

Plaintiff slept more during the day than at night (Tr. 51). She did not perform any household chores on a regular basis and sometimes required help getting out of the shower due to dizziness and help dressing due to muscle spasms (Tr. 51-52). She experienced "bad"

days around twice a week at which time she was unable to move her limbs and had migraines with blurry vision (Tr. 52). She experienced occasional left arm and hand numbness and tingling which caused difficulty grasping (Tr. 52). She was able to use her left hand for up to 40 minutes before experiencing finger numbness (Tr. 53). Her ability to sit was limited by lower back pain (Tr. 53). She was unable to drive due to seizures (Tr. 53). She estimated that during "good months," she was able to make $1,000 painting nails (Tr. 53). She began treating with Dr. Lerner in January, 2014 (Tr. 56). She no longer saw him because he was under criminal investigation but he had provided an assessment of her physical abilities in March, 2015 (Tr. 54-55). She denied the use of alcohol or street drugs (Tr. 55). She used to read novels but now limited her reading to "glanc[ing] through" magazines (Tr. 55).

### B.    Medical Evidence

#### 1. Treating Sources

Plaintiff received emergency treatment following a January 6, 2014 motor vehicle accident (Tr. 547-55). Plaintiff, restrained in the passenger seat at the time of impact, reported to emergency room personnel that a snow plow "grazed the driver's door" at a speed of approximately 10 miles per hour[1] (Tr. 550). She reported lumbar pain but exhibited a full

---

[1] A Dearborn Heights Fire Department report states that the snow plow hit Plaintiff's vehicle at a speed of approximately 20 to 25 miles per hour (Tr. 674). Plaintiff complained of back pain at the site of the accident was able to walk (Tr. 674). A physical examination was otherwise unremarkable (Tr. 674).

range of lower extremity motion (Tr. 550). She denied head, neck, chest, or abdominal pain (Tr. 550). Treating records state that the car was traveling "at a low speed" and that "she was ambulatory at the scene" (Tr. 550). She exhibited normal coordination (Tr. 551). A clinical examination and imaging studies of the lumbar spine were both unremarkable (Tr. 552, 555).

Later the same month, Laran Lerner, D.O. examined Plaintiff, noting her report of neck, left shoulder, back and left knee pain, headaches, and nausea, blurred vision, and paresthesias of the left hand (Tr. 403, 393). Plaintiff reported that her vehicle was hit by a snow plow traveling 40 miles per hour and that the hit was "hard and fast" (Tr. 403). Plaintiff had a two-minute grand mal seizure (at the end of a nerve conduction study) characterized by falling from the table and drooling (Tr. 393-394). Results of the partially finished nerve conduction study were unremarkable (Tr. 395). Dr. Lerner found "no evidence of cervical radiculopathy" (Tr. 401). A February, 2014 MRI of the brain ordered in response to Plaintiff's report of headaches, dizziness, and blurred vision was wholly unremarkable (Tr. 600). MRAs of the brain were likewise unremarkable (Tr. 589, 599). An MRI of the lumbar spine showed a disc bulge compressing the thecal sac at L3-L4 but no stenosis or neuroforaminal narrowing (Tr. 602). At L4-L5 and L5-S1, the study showed "mild neuroforaminal compromise" but no stenosis (Tr. 602). An MRI of the thoracic spine showed disc bulges at T5-T6 and T7-T8 with compression of the ventral theca sac but no other abnormalities (Tr. 597). An MRI of the cervical spine showed "protrusion type

herniations" compressing the ventral theca sac at C3-C4, C4-C5, C5-C6, and C6-C7 (Tr. 595). An MRI of the left shoulder revealed at most "very mild tendonitis" (Tr. 593). An MRI of the left knee showed a possible "very small tear or fissure in the meniscal cartilage" (Tr. 591).

Dr. Lerner observed that Plaintiff was fully oriented with good concentration despite allegations of "headaches, problems with memory, thinking, and concentration" (Tr. 379, 384). Dr. Lerner noted 5/5 muscle strength and normal muscle tone and bulk in all extremities (Tr. 379). He noted normal reflexes and coordination but "difficulty with tandem gait" (Tr. 379). Dr. Lerner noted "[n]o evidence of a central or cord etiology for [back] pain" (Tr. 379). He prescribed Ultram and physical therapy and later the same month, advised Plaintiff to follow up with chiropractic and physical therapy treatment (Tr. 379, 384, 386-387, 409-410). He found that Plaintiff required household replacement services for approximately one month due to her inability to bend, twist, lift, and stand for extended periods (Tr. 414).

In April, 2014, neurologist Nawab Murshed, M.D. examined Plaintiff, noting her reported that she was able to manage pain with physical therapy and Ultram (Tr. 452, 502). Plaintiff appeared "alert and oriented" with good concentration and full muscle strength (Tr. 452). She denied recent seizures (Tr. 452). Dr. Murshed's notes from the next month note Plaintiff's report of "a few dizzy spells" but denial of seizures (Tr. 450, 495). She exhibited full muscle strength (Tr. 450-451).

May, 2014 intake records by psychiatrist Thomas Park, M.D. note Plaintiff's report of "seizure disorder," headaches, light-headedness, mood swings, depression, and a sleep disorder (Tr. 437). Plaintiff alleged five seizures since the accident, characterized by the inability to move her body upon waking and lasting for approximately five minutes (Tr. 437, 440). Plaintiff denied loss of consciousness at the time of the accident (Tr. 437). She reported problems concentrating (Tr. 435). Dr. Park noted her report of "flashbacks" and a restricted affect (Tr. 437). He observed an "exaggerated startle response" (Tr. 438). He noted symptoms of Post Traumatic Stress Disorder ("PTSD"), depression, anxiety, and mild neurocognitive disorder (Tr. 432-433, 435). The same month, Dr. Lerner administered an epidural steroid injection without complications (Tr. 498). Obstetric records from the same month, noting "many social issues," state that the father of Plaintiff's prospective baby (due in mid-October, 2014) was married and in jail (Tr. 579). The following month, Dr. Park noted that Plaintiff had not taken medication regularly (Tr. 431). Also in July, 2014, Dr. Lerner administered an epidural steroid injection and recommended additional physical therapy (Tr. 485, 490).

In August, 2014, Dr. Park noted a partial improvement of symptoms with "good medication compliance" (Tr. 429). He noted reduced daytime sleepiness, "intact and unimpaired" "self care skills, and intact "domestic skills" (Tr. 429). Plaintiff noted a breakdown of family relationships but denied medication side effects (Tr. 429). The same month, Dr. Lerner stated that Plaintiff required both housework/replacement services and

attendant care services (Tr. 479). Dr. Murshed's notes from the same month state that Plaintiff's headaches were improved with medication (Tr. 448, 483). Plaintiff reported a seizure in the previous month (Tr. 448). She exhibited good concentration and full muscle strength (Tr. 448, 658).

September, 2014 records by Dr. Lerner note that a pregnancy test was positive (Tr. 475). On September 28, 2014, Plaintiff gave birth to a girl by cesarian section (Tr. 558). In October, 2014, Dr. Lerner noted a diagnosis of "seizures do (sic) to MVA" (Tr. 415). The following month, Dr. Lerner administered epidural steroid injections (Tr. 465).

In February, 2015, MRA and MRVs of the brain were unremarkable (Tr. 604-605, 649, 650-651). Dr. Murshed observed an unremarkable affect and neurological findings but an antalgic gait (Tr. 667-668). The following month, Dr. Murshed completed a medical source statement, finding that Plaintiff experienced PTSD, seizures, and lumbar spine pain (Tr. 522). He noted that Plaintiff's medications caused the side effect of drowsiness, dizziness, nausea, and confusion (Tr. 522). He further noted the diagnoses of depression and anxiety (Tr. 523). He found that due to muscle weakness, Plaintiff was unable to sit or stand for more than five minutes at a time and was unable to sit, stand, or walk for even two hours in an eight-hour workday (Tr. 523). He found that Plaintiff needed to elevate her legs to waist level while sitting and that she required the use of a cane while standing or walking (Tr. 524). He precluded Plaintiff from all postural activity and limited her to rare manipulative activities (Tr. 524). He found that she was incapable of even low stress work and would

require more than four or more absences each month (Tr. 525).

Also in March, 2015, Dr. Lerner composed a summary of Plaintiff's medical condition, noting that she exhibited a reduced range of cervical and lumbar spine motion and an antalgic gait (Tr. 607). He noted that she had had "intermittent dizziness and lightheadedness" and "intermittent" seizures for which she was treated with Depakote (Tr. 607). He noted that EMG studies performed in January, 2014 were consistent with L4-L5 radiculopathy (Tr. 608). He found that Plaintiff continued to require assistance with "household chores, attendant care, and transportation assistance" (Tr. 612). In an accompanying assessment, he found that Plaintiff was unable to sit, stand, or walk for even two hours in an eight-hour workday and when sitting, needed to elevate her legs to waist level (Tr. 615-616). He found that she was limited to lifting 10 pounds on an occasional basis and precluded from all postural activity except for rare twisting and stooping (Tr. 616). He limited manipulative activity to a rare basis (Tr. 616). He found she was capable of low stress work but required more than four absences each month (Tr. 617).

In April, 2015, Dr. Lerner prescribed three weeks of physical therapy (Tr. 644). May, 2015 x-rays of the lumbar spine were unremarkable (Tr. 541, 546). Dr. Lerner's July, 2015 records state that Plaintiff demonstrated a limited range of cervical and lumbar spine motion (Tr. 625). Dr. Murshed's June, 2015 records note Plaintiff's report of worsening headaches (Tr. 661). A neurological examination was unremarkable (Tr. 661).

## 2. Consultative and Non-Examining Sources

In June, 2014, David Carr, D.O. performed a consultative examination on behalf of Esurance in regard to litigation stemming from the vehicle accident, noting Plaintiff's report of back and lower extremity pain and headaches (Tr. 678). She report four seizures since the January, 2014 accident (Tr. 679). Dr. Carr noted no upper extremity weakness but a mildly reduced range of cervical spine motion (Tr. 681). He noted that Plaintiff did not require the use of a cane and did not experience difficulty walking (Tr. 682). Dr. Carr found the absence of any neurologic deficit (Tr. 687). He concluded that the motor vehicle injuries were limited to "soft tissue strain/sprain of the cervical and lumbar regions" (Tr. 687). He found that the disc bulges more likely related to Plaintiff's obesity and three earlier pregnancies (Tr. 687). He found that Plaintiff did not require additional physical therapy, injections, or chiropractic treatment (Tr. 688-689). He limited Plaintiff to lifting 10 pounds on an occasional basis and work with a sit/stand option (Tr. 690). He found that Plaintiff required two to three hours of attendant care daily due to her need to care for her three young children (Tr. 691).

The follow month, Zachary Endress Jr., M.D. also performed a one-time exam on behalf of Esurance, noting a full range of cervical spine motion and left shoulder motion (Tr. 694). Neurological testing of the spine and lower extremities was unremarkable (Tr. 694). Dr. Endress concluded that Plaintiff did not require household or attendant care and could return to work (Tr. 695-696).

In March, 2015, Jocelyn Markowicz, Ph.D. performed a consultative psychological examination on behalf of the SSA, noting Plaintiff's report that she was unable to care properly for her children since the accident (Tr. 527). Dr. Markowicz noted "insufficient information for a "mental disorder" diagnosis, concluding that is was "likely" that Plaintiff was experiencing an adjustment disorder (Tr. 527). Dr. Markowicz noted that Plaintiff arrived on time for the examination with an appropriate mood and grooming but seemed "disinterested in participating in the examination" (Tr. 528). Dr. Markowicz concluded that Plaintiff was able to understand and remember "instructions, locations, and work-like procedures" (Tr. 530). She found that Plaintiff had adequate insight and judgment to act appropriately in a work setting (Tr. 530).

The following month, Elizabeth Edmond, M.D. performed a consultative physical examination on behalf of the SSA, noting Plaintiff's report that she experienced a seizure one month earlier (Tr. 533). Dr. Edmond noted that a February, 2015 EEG was normal (Tr. 533). She noted that she was not able to evaluate Plaintiff's lumbar range of motion due to a lumbar brace (Tr. 534). She observed that Plaintiff did not use a cane or walker but experienced difficulty in tandem walking (Tr. 534). She observed no atrophy of the upper extremities or coordination problems and noted that Plaintiff's ability to perform a variety of daily activities was unencumbered except for limitations in bending and squatting (Tr. 534, 538). She found sufficient bilateral grip strength (Tr. 535). She concluded that she might be a candidate for vocational rehabilitation due to her past work as a nurse (Tr. 535).

Also in April, 2015, Leonard C. Balunas, Ph.D. performed a non-examining review of the medical records related to the psychological conditions on behalf of the SSA, finding that Plaintiff experienced mild restriction in activities of daily living and moderate limitation in social functioning and concentration, persistence, or pace (Tr. 71). Dr. Balunas adopted Dr. Markowicz's finding of insufficient evidence to support a psychological diagnosis which would prevent Plaintiff from performing a range of substantial gainful activity (Tr. 73). He found that Plaintiff was capable of carrying out "one and two-step tasks" that did not require "sustained concentration" (Tr. 76).

In May, 2015, Quan Nguyen, M.D. performed a non-examining review of the records pertaining to Plaintiff's physical condition, finding that she could lift 20 pounds occasionally and 10 frequently; sit, stand, or walk for six hours in an eight-hour workday; and push and pull without limitation (Tr. 73). He found that she was precluded from all climbing of ladders, ropes, or scaffolds and was limited to frequent (as opposed to *constant*) bilateral overhead reaching and handling with the left hand (Tr. 74). He found that Plaintiff should avoid all exposure to hazards such as machinery and heights (Tr. 75).

In August, 2015, neurologist William V. Leuchter, M.D. performed a one-time examination, noting that Plaintiff did not experience cognitive or concentrational problems (Tr. 700). Plaintiff exhibited full muscle strength and a normal neurological abilities with a normal gait (Tr. 700, 704). Dr. Leuchter noted a probable diagnosis of "posttraumatic headaches with migrainous components," recommending a prescription for Topamax or

Gabapentin (Tr. 704). He found that she was currently "disabled from employment" due to "the difficulty in arriving at a definitive diagnosis in terms of [] seizures" (Tr. 705). He found that she was able to perform household chores and did not require attendant care (Tr. 705-706).

### C.     Vocational Expert Testimony

VE Castellana classified Plaintiff's past relevant work as a direct care worker as exertionally medium (exertionally heavy as described by Plaintiff); home care giver, medium; companion, light; and nail technician, sedentary[2] (Tr. 357). The VE stated that all of the positions were semiskilled (Tr. 357). The ALJ posed the following set of limitations to the VE, describing a hypothetical individual of Plaintiff's age, education, and work background:

> [L]imited to light work with occasional climbing, balancing and stooping, kneeling, crouching and crawling; cannot use ladders and must avoid unprotected heights and moving machinery; and no overhead lifting. [W]ould that allow for any past relevant work? (Tr. 57).

The VE responded that the hypothetical individual could perform Plaintiff's past relevant work as a companion and nail technician (Tr. 57). The VE testified that if the same

---

[2]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

individual were limited to sedentary work, the companion work would be eliminated (Tr. 58). The VE testified further that if the same person were limited to "simple, routine and repetitive tasks, that require little judgment, even in a short period time of no interaction with the general public," with only "occasional interaction with coworkers," all of the past relevant work would be eliminated (Tr. 58). However, the VE found that the restrictions allowed for the unskilled, sedentary work of a sorter/inspector (2,500 jobs in the regional economy); assembler (2,500); and packager (2,200) (Tr. 58). The VE testified that the need to change between sitting and standing every 15 minutes would halve the job numbers (Tr. 58-59). The VE testified that the need to use a cane would not reduce the job numbers (Tr. 59). The VE stated that her testimony was consistent with the information found in the *Dictionary of Occupational Titles* ("*DOT*") except for the testimony regarding a sit/stand option which was based on her own professional experience (Tr. 59-60).

In response to questioning by Plaintiff's attorney, the VE stated that the need to hold on to a surface while working in a standing position would eliminate the packaging and assembly jobs and leave only 600 sorter/inspector jobs in the region (Tr. 60). The VE stated that the need for additional, unscheduled breaks (in addition to normally scheduled breaks) or, the need to elevate the legs to waist level would preclude all work (Tr. 60).

## D. The ALJ's Decision

At Step One of the administrative analysis, the ALJ noted that there was "no clear answer" as to whether Plaintiff engaged in Substantial Gainful Activity ("SGA") following the alleged onset of disability (Tr. 12-13). He noted that Plaintiff reported $14,846 in self employment in 2014 (Tr. 12). The ALJ stated that although his analysis would "proceed through the remainder of the sequential evaluation," Plaintiff's "conflicting reports regarding her wages after the alleged onset date do not favor her credibility" (Tr. 13). Next, citing the medical records, ALJ Sasena found that Plaintiff experienced the severe impairments of "degenerative disc disease; degenerative joint disease; posttraumatic seizures; posttraumatic headaches; posttraumatic stress disorder . . . mild cognitive disorder; depressive disorder; lumbago; and cervicalgia" but that none of the conditions met or medically equaled impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 13). He found that Plaintiff experienced mild limitation in activities of daily living and moderate limitation in social functioning and concentration, persistence, or pace (Tr. 14). The ALJ found that Plaintiff had the Residual Functional Capacity ("RFC") for sedentary work with the following additional limitations:

> [S]he needs a sit/stand option after 15 minutes; can never climb ladders, but can occasionally climb, balance, stoop, kneel, crouch, or crawl; should avoid all exposure to unprotected heights and moving machinery; should do no overhead lifting; requires a cane for walking more than 10 feet; is limited to simple routine repetitive tasks that require little judgment and can be . . . learned in a short time; with no interaction with the general public and only occasional interaction with coworkers (Tr. 15).

Citing the VE's findings, the ALJ found that Plaintiff could work as a sorter, assembler, or inspector (Tr. 27-58-59).

The ALJ discounted Dr. Lerner's finding that Plaintiff was disabled from January, 2014 forward (Tr. 17-18). The ALJ noted that the imaging studies showing mild abnormalities did not support the claim of disability (Tr. 18). He noted that in contrast to Dr. Lerner's disability finding, Dr. Murshed found in February, 2014 that Plaintiff exhibited full muscle strength (Tr. 18). The ALJ noted that the February, 2014 MRA of the brain was normal and that an MRI of the left shoulder showed "very mild" tendinosis (Tr. 19, 21). He noted that an April, 2014 EEG was normal at that in July, 2014, Plaintiff denied continuing seizures (Tr. 19). The ALJ found that Plaintiff's inconsistent statements regarding seizure activity undermined her credibility (Tr. 20).

### III. STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way,

without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## IV. FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof as steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy."

*Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## V.  ANALYSIS

In her sole argument for remand, Plaintiff contends that the ALJ erred by according "little weight" to Dr. Lerner's disability opinions.  *Plaintiff's Brief,* 3-9, *Docket #17* (*citing* Tr. 17, 22).  In a nutshell, Plaintiff disputes the ALJ's finding that Dr. Lerner's opinion was not supported by the treating, consultative, and non-examining evidence.  *Id.*

### 1.  The Treating Physician Analysis - Basic Principles

"[I]f the opinion of the claimant's treating physician is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, it must be given controlling weight." *Hensley v. Astrue,* 573 F.3d 263, 266 (6th Cir. 2009)(internal quotation marks omitted)*(citing Wilson,* 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(c)(2)). However, in the presence of contradicting substantial evidence, the ALJ may reject all or a portion of the treating source's findings, see *Warner v. Commissioner of Social Sec.*, 375 F.3d 387, 391-392 (6th Cir. 2004), provided that he supplies "good reasons" for doing so. *Wilson*, at 547; 20 C.F.R. § 404.1527(c)(2))[3].  The failure to articulate "good reasons" for rejecting a treating physician's

---

[3]

In explaining the reasons for giving less than controlling weight to the treating physician opinion, the ALJ must consider (1) "the length of the ... relationship" (2) "frequency of examination," (3) "nature and extent of the treatment," (4) the "supportability of the opinion," (5) "consistency ... with the record as a whole," and, (6) "the specialization of the treating source." *Wilson*, at 544.

opinion constitutes reversible error. *Gayheart v. CSS*, 710 F.3d 365, 376 (6th Cir. 2013).

"[T]he Commissioner imposes on its decision-makers a clear duty to 'always give good reasons in our notice of determination or decision for the weight we give [a] treating source's opinion.'" *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). "These reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.' " *Gayheart*, at 376 (citing SSR 96–2p, 1996 WL 374188, *5 (1996)).

### 2. The ALJ's Findings

The ALJ accorded "little weight" to both Dr. Lerner's periodic statements that Plaintiff was disabled and required attendant care, and the March, 2015 assessment of Plaintiff's work–related abilities (Tr. 17, 22). As to the periodic statements, the ALJ noted that Dr. Lerner's opinion was contradicted by neurologist Dr. Murshed's findings (from February, 2014 onward) of good concentrational abilities, normal speech, full muscle strength, normal reflexes, and good coordination (Tr. 18). The ALJ noted that the MRIs of the shoulder and knee showed essentially normal findings (Tr. 18-19). He found further that the MRI and MRA of the brain did not support Plaintiff's claim of significant neurological problems (Tr. 19). He pointed out that while Plaintiff reported a  seizure " in the prior month" to Dr. Murshed on August 1, 2014, she denied recent seizures to Dr. Lerner at a July

30, 2014 appointment (Tr. 19). The ALJ cited Dr. Park's August, 2014 finding that Plaintiff was independent in self-care and household tasks (Tr. 20).

The ALJ supported his rejection of Dr. Lerner's March, 2015 finding that Plaintiff was unable to sit, stand, or walk for even two hours, lift more than 10 pounds, and needed to elevate her legs to waist level by citing Dr. Edmond's findings that Plaintiff was able to walk without a cane or walker and did not exhibit upper extremity atrophy, and an unremarkable x-ray of the lumbar spine (Tr. 25). As to the alleged mental and neurological limitations, the ALJ cited Dr. Markowitz's observation that the examination did not suggest a psychological or cognitive disorder (Tr. 25). The ALJ observed that Dr. Lerner's finding of extreme limitation were also undermined by charges of "Medicare/Medicaid fraud" (Tr. 26).

The ALJ accorded "little weight" to Dr. Nguyen's finding that Plaintiff was capable of exertionally light work, acknowledging that the record as a whole supported a a limitation to sedentary work with a sit/stand option and postural limitations (Tr. 15, 26).

### 3. Analysis

Plaintiff argues, in effect, that the ALJ's rejection of Dr. Lerner's opinion is based on an erroneous reading of the record. First, she faults the ALJ for discounting Dr. Lerner's opinion on the basis that it was inconsistent with Dr. Murshed's observations. She argues that findings by Dr. Murshed, a neurologist, were improperly used to discount Dr. Lerner's

findings regarding the "musculoskeletal impairments." *Plaintiff's Brief* at 4. However, the ALJ did not err in noting that Dr. Murshed's observations regarding Plaintiff's neurological and musculoskelatal conditions contradicted Dr. Lerner's findings of extreme limitation. Dr. Murshed's April, 2014 observations included "full muscle strength" and Plaintiff's report that she had not experienced recent seizures (Tr. 450-452). Dr. Murshed's September, 2014 records note good muscle strength and that the headaches were improved with medication (Tr. 448). Because Dr. Murshed's findings included note of Plaintiff's musculoskelatal as well as neurological condition, the ALJ did not err in finding that Dr. Murshed's observations of good muscle strength stood at odds with Dr. Lerner's finding that Plaintiff was unable to sit, stand, or walk even two hours in an eight-hour workday or perform any postural activity[4] (Tr. 615-616).

Continuing in a similar vein, Plaintiff argues the consultative and non-examining findings also support Dr. Lerner's finding that Plaintiff was incapable of even sedentary work. *Plaintiff's Brief* at 5-6. She cites Dr. Carr's June, 2014 finding of a reduced range of motion and a positive straight leg raise (Tr. 728-729). However, while Plaintiff's characterizes the treating and consultative findings as "similar," the ALJ did not err in concluding that as a whole, Dr. Carr's findings were dramatically less extreme than Dr.

---

[4]Although not argued by Plaintiff, the ALJ likewise did not err in rejecting Dr. Murshed's February, 2015 opinion that Plaintiff was unable to sit or stand for more than five minutes due to muscle weakness (Tr. 22 *citing* 523) on the basis that it contradicted Dr. Murshed's own treating notes showing good muscle strength and the absence of neurological symptoms (Tr. 450-451).

Lerner's. For example, Dr. Lerner found that Plaintiff was limited to "rare" manipulative activity, precluded from all postural functioning, and unable to sit, stand, or walk for even two hours in eight (Tr. 615-616). In contrast, Dr. Carr found no upper extremity weakness and noted that Plaintiff did not require the use of a cane and did not experience problems walking (Tr. 681-682).

On a related note, the ALJ did not err in crafting the RFC for sedentary work with a sit/stand option which was based in part on Dr. Carr's consultative findings (Tr. 15). See SSR 96–6p, 1996 WL 374180, *3. (July 2, 1996)("In appropriate circumstances," the opinion of non-examining source "may be entitled to greater weight than the opinions of treating or examining sources"); § 404.1527(e)(2)(I); *See also Brooks v. CSS*, 531 Fed.Appx. 636, 642 (6th Cir. August 6, 2013)(same). While Plaintiff also faults the ALJ for declining to base the RFC on any one medical opinion, the fact that the ALJ declined to adopt any of the medical opinions verbatim in crafting the physical RFC does not provide grounds for remand. *See Rudd v. Commissioner of Social Sec.,* 531 Fed.Appx. 719, 726–27 (September 5, 2013)(*citing Coldiron v CSS*, 391 Fed.Appx. 435, 439 (6th Cir. August 12, 2010) ("'The Social Security Act instructs that the ALJ, not a physician, ultimately determines a claimant's RFC.... An ALJ does not improperly assume the role of a medical expert by weighing the medical and non-medical evidence before rendering an RFC finding'"). Further, the ALJ provided ample discussion of the treating, consultative, and non-examining opinions and his reasons for according more weight to some than others. For example, while Dr. Nguyen, a non-

examining source, concluded that Plaintiff could perform exertionally light work (Tr. 73) the ALJ reasonably found that the treating and consultative records, considered in their entirety, supported a limitation to sedentary work (Tr. 26). The ALJ was likewise entitled to reject Dr. Lerner's finding that Plaintiff was unable to perform even sedentary work in favor of a less restrictive RFC.

Finally, Plaintiff's assertion that the rejection of Dr. Lerner's opinion and the rationale for the RFC is supported by only legal "boilerplate" is defeated by the ALJ's nine-page discussion of the medical records, including numerous references to the clinical findings and imaging studies pointing to less than disabling symptoms (Tr. 17-26). Plaintiff's characterization of the analysis of Dr. Lerner's findings as "terse," *Plaintiff's Brief* at 7, is particularly specious, given that the ALJ referenced the treating physician's findings at numerous points in his determination (Tr. 17, 18, 19, 20, 21, 22, 23, 25, 26). Further, the ALJ did not err in discrediting Dr. Lerner's opinions (in part) based on charges of Medicare/Medicaid fraud against the treating physician. *See* 20 C.F.R. §§ 404.1527(c)(6)(in determining weight accorded treating opinion, ALJ entitled to consider "any factors" supporting or undermining opinion).

In closing, my recommendation to uphold the ALJ's decision should not be read to trivialize Plaintiff's legitimate physical limitations or personal challenges. Nonetheless, the determination that she was capable of a range of unskilled, sedentary work is well within the "zone of choice" accorded to the fact-finder at the administrative hearing level and should

not be disturbed by this Court. *Mullen v. Bowen*, *supra*.

## VI. CONCLUSION

For the reasons stated above, I recommend that Plaintiff's Motion for Summary Judgment [Dock. #17] be DENIED, and that Defendant's Motion for Summary Judgment [Dock. #18] be GRANTED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated: May 17, 2017

## CERTIFICATE OF SERVICE

I hereby certify on May 17, 2017, that I electronically filed the foregoing paper with the Clerk of the Court sending notification of such filing to all counsel registered electronically. I hereby certify that a copy of this paper was mailed to non-registered ECF participants.

s/Carolyn Ciesla
Case Manager to
Magistrate Judge R. Steven Whalen